IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NUMBER 2:19-CV-442-FTM-29MRM

CMR CONSTRUCTION & ROOFING, LLC
A/A/O LAWRENCE FARRINGTON,

    PLAINTIFF,

vs.

ASI PREFERRED INSURANCE CORP.,

    DEFENDANT.

------

### OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

CMR CONSTRUCTION & ROOFING, LLC A/A/O LAWRENCE FARRINGTON (hereinafter "CMR") files this, its Opposition to ASI PREFERRED INSURANCE CORP'S (hereinafter "ASI") Motion for Summary Judgment:

### Response to ASI's Statement of Material UnDisputed Facts

1.     Admitted.

2.     Admitted.

3.     Admitted.

4.     CMR admits that ASI sent correspondence dated November 11, 2018, but denies that the reporting of the claim was late, that the references to the Policy apply to the facts and circumstances of this case or that ASI complied with Florida's Claims Administration Statute.

5.     Admitted.

6. Denied. ASI's characterization that Mr. Farrington testified that the cleaning technician power washed his roof and told Mr. Farrington of the damage "shortly" after Hurricane Irma is not supported by the transcript. Mr. Farrington could not recall when that conversation occurred:

> Q. But did the pressure washing company tell you that there was Irma damage to your roof?
> A. Yes.
> Q. And when did they tell you that?
> A. When I saw them. I don't know. That's years, three years ago. My roof needs power washed again. If you could take, if you put the new tile on it, it won't have to.[1]

7. Admitted that Mr. Farrington hired someone to make repairs to broken tile, but the testimony is not clear with respect to when those repairs were made or that they are in connection with Hurricane Irma.

8. Admitted that ASI sent correspondence as to what it believed to be the damages at issue, but there is a question of fact as to the amount, scope and cause of the damage to the roof.[2]

9. Admitted.

10. Admitted.

11. Denied. Line 41 is to replace the entire door, with the screen included.[3]

12. Admitted.

---

[1] Tr. L. Farrington, p. 26:17-24 (July 29, 2020) [D.E. 48.1].

[2] Tr. R. Peak, p. 76:2-12 (May 1, 2020) [D.E. 49-2]; Estimate prepared by R. Peak, attached as Exhibit 2 to Tr. R. Peak [D.E. 49-2]; Tr. D. Cronin, p. 68:9-25, 69:1-24 (August 19, 2020) [D.E. 47-1].

[3] Estimate prepared by R. Peak, ln. 41, attached as Exhibit 2 to Tr. R. Peak [D.E. 49-2].



13. Denied with respect to the characterization that Mr. Farrington is qualified to testify as to whether there is "direct damage" to the gutters.  Ryan Peak testified that the replacement of the gutters are a natural and foreseeable consequence to the replacement of the roof as well as a requirement under Florida's Building code.[4]

14. Admitted.

15. Admitted, but denied as to the age of the roof.

16. Admitted, among other conditions identified throughout deposition testimony and the report itself.

17. Admitted.

18. Denied.  ASI isolates one question, while the testimony makes it clear that Derek Cronin found a significant amount of damage which he attributes to Hurricane Irma.[5]

19. Denied.  Derek Cronin testified that it is very difficult to have a definitive number as to how many tiles were cracked by Hurricane Irma.[6]  Derek Cronin made it clear that his opinions and conclusions were being made within a reasonable degree of engineering certainty.[7]

20. Denied.  Derek Cronin made it clear that there were several factors that lend to his opinion that the roof requires replacement.[8]

---

[4] Tr. R. Peak, p. 77:15-25, 78:1-25, 79:1-8 [D.E. 49-2].

[5] Tr. D. Cronin, p. 40:14-25 [D.E. 49-2].

[6] Tr. D. Cronin, p. 46:3-6 [D.E. 49-2].

[7] Tr. D. Cronin, p. 74:5-9 [D.E. 49-2].

[8] Tr. D. Cronin, p. 68:9-25, 69:1-24 [D.E. 47-1].



21.     Denied. Derek Cronin made it clear that there were several factors that lend to his opinion that the roof requires replacement.[9]

22.     Denied. Derek Cronin made it clear that there were several factors that lend to his opinion that the roof requires replacement.[10]

23.     Denied with respect to how ASI characterizes the testimony.

24.     Denied. Justin Mickey prepared a report for which he reached certain opinions and conclusions made within a reasonable degree of engineering certainty.[11]

25.     Denied. Justin Mickey prepared a report for which he reached certain opinions and conclusions made within a reasonable degree of engineering certainty.[12]

26.     Admitted.

27.     Admitted.

28.     Admitted.

29.     Denied as to ASI's interpretation of the Policy and relevant legal authority.

30.     Admitted.

31.     Admitted.

32.     Admitted.

## Memorandum of Law

I.    Prompt Notice

There is no *per se* timeliness bar for filing notice of a claim, and because the analysis surrounding whether that notice was "prompt" focuses upon the facts and circumstances of

---

[9] Tr. D. Cronin, p. 68:9-25, 69:1-24 [D.E. 47-1].

[10] Tr. D. Cronin, p. 68:9-25, 69:1-24 [D.E. 47-1].

[11] Roof Assessment attached to Dec. J. Mickey [D.E. 45-1] as Exhibit "A".

[12] Roof Assessment attached to Dec. J. Mickey [D.E. 45-1] as Exhibit "A".



each particular case, it is only appropriate for a jury's determination. *Oriole Gardens Condominiums, III v. Independence Cas. & Sur. Co.*, 2012 WL 718803 (U.S. Dist. Ct. S.D. Fla. 2012). "Notice is necessary when there has been an occurrence that should lead a reasonable and prudent man to believe that a claim for damages would arise." *Borosky v. Hartford Fire Ins. Co.*, 2009 WL 10668513, at *3 (U.S. Dist. Ct. S.D. Fla.). "What is 'reasonable' depends on the circumstances and is ordinarily a question of fact for the fact finder." *Id.* In *Borosky*, in determining whether notice was prompt, the court focused on the fact that the insured knew the home was damaged, but did not report the loss until twenty one (21) months later. *Id.* at *4. Similarly, Florida's Third District Court of Appeal interpreted a policy's 'prompt notice' provision that is similar to the one at issue in this case and held that because the damages were not apparent until three years later, there remained a question of fact as to whether notice was 'prompt.' *Laquer v. Citizens Prop. Ins. Corp.*, 167 So.3d 470, 474-75 (Fla. App. Ct. 2015). The *Laquer* court acknowledged a contrary decision in *Soronson v. State Farm Florida Insurance Co.*, but distinguished *Soronson* "because the policy language at issue required notice and a sworn proof of loss within a fixed time from the date of the loss. Unlike *Soronson,* the policy language here does not tie the notice and proof of claim to a fixed time from the date of loss." *Id. cf. Soronson v. State Farm Florida Insurance Co.*, 96 So.3d 949 (Fla. App. Ct. 2015).[13]

Mr. Farrington testified that he was not aware of any damage to the roof until about a year after Hurricane Irma, and only after being advised of the damage by CMR and a pressure cleaner:

---

[13] The policy at issue in *Laquer* required, . The policy at issue in *Soronson* imposed a duty upon the insured "[a]fter a loss ... [the insureds] shall ... give immediate notice to [the insurer]" and shall "submit to [the insurer], within 60 days after the loss, [the insureds'] signed, sworn proof of loss." *Soronson* at 952.



> Q. Is there a reason why you waited approximately a year to report the claim to your insurance company?
>
> A. Probably because I didn't think much was wrong.[14]
>
> * * *
>
> Q. And when did you first notice cracking?
>
> A. Probably two – at least a year ago, but I didn't do anything with it.
>
> Q. Did you notice cracking to your roof immediately after Hurricane Irma passed through?
>
> A. No.[15]
>
> * * *
>
> Q. So you noticed cracking to the right side of your roof?
>
> A. Right.
>
> Q. And that was immediately after Irma?
>
> A. Not immediately, but it was after Irma.
>
> Q. Would you say it was the same month?
>
> A. Probably a year, year and a half. But I've never had any leaks.[16]

The policy in this case does not tie the requirement of prompt notice within a fixed time from the date of loss. Thus, the discovery of the damaged caused by Hurricane Irma should be the focal point of this Court's analysis. It is undisputed that CMR first inspected Mr. Farrington's roof in March of 2018, and the claim was reported in September of 2018. The question as to whether six months is within the timeframe of a reasonably prudent person is a question for the jury, and thus summary judgment should not be granted.

Notwithstanding, and as acknowledged by ASI in its motion, even if notice was not "prompt," as a matter of law, the presumption of prejudice may be rebutted in order to avoid a forfeiture. *See e.g. Kendall Lakes Towers Condominium Ass'n. v. Pacific Ins. Co., Ltd.*, 2012

---

[14] Tr. L. Farrington, 42-43;23-2 [D.E. 48-1].

[15] Tr. L. Farrington, 43:14-20 [D.E. 48-1].

[16] Tr. L. Farrington, 44:1-8 [D.E. 48-1].



WL 266438 *4 (U.S. Dist. Ct. S.D. Fla. 2012). In *Kendall Lakes*, Pacific's expert testified that his ability to determine the extent of the damage was "severely lessened" due to the passage of time and that it was too difficult to determine the cause of the damage. *Id*. Notwithstanding, the court noted that the expert was able to rule out the notion that the damage was caused by a hurricane, while other experts were able to determine the cause of loss. Thus, there existed a question of fact surrounding prejudice, which precluded the entry of summary judgment. *Id*. Similarly, in *Oriole Gardens*, the insurance company was able to fully investigate and evaluate the nature of the hurricane damage sustained by Oriole Gardens. *Oriole Gardens* at *10. Thus, the court could not determine, as a matter of law, that the carrier was prejudiced. *Id*. When there is evidence that the insurer could reach a determination as to the cause of the damage, then the question of prejudice should only be determined by a jury. *See Stark v. State Farm Florida Ins. Co.*, 95 So.3d 285 (Fla. App. Ct. 2012).

In support of ASI's assertion that it was prejudiced by the delay in reporting the claim, it filed two declarations. The statement made by Justin Mickey, P.E., that his inspection was hindered by the passage of time because "a timely inspection would have allowed [him] to more easily determine whether the conditions [he] observed on the roof resulted from post-loss maintenance and/or repairs, or if they were present before Hurricane Irma," should be stricken as it is conclusory and contradicts his declaration and report.[17] Mr. Mickey declared that he was able to conclude that the vertically cracked tiles were caused by individuals walking on the roof, and that the right corner cracked tiles were attributed to thermal

---

[17] Dec. R. Brown, ¶¶ 9-10 [D.E. 46-1].



expansion or contraction.[18] Mr. Mickey did observe some damage caused by Hurricane Irma, but he believes that those damages could be repaired.[19] Mr. Mickey even admitted that he was able to determine the cause of the damage he observed.[20]

ASI also filed a declaration from its own Corporate Representative.[21] Notably, nowhere in that declaration is there testimony that ASI was prejudiced by the notice that was provided. In fact, the declaration makes it clear that ASI conducted more than one inspection and that it was able to identify damage caused by Hurricane Irma and was able to prepare an estimate for those damages.[22] Unfortunately for CMR and Mr. Farrington, ASI concluded that the damage that was caused by Hurricane Irma fell below the Policy's deductible.[23] Tellingly, attached to ASI's declaration as Exhibit "C" is correspondence from ASI to Mr. Farrington that advises him of ASI's decision with respect to the Claim. Nowhere in that letter does ASI assert that they were prejudiced by the timeliness of the reporting of the claim.[24]

Both CMR and Cronin Engineering were able to inspect the roof, take photographs and reach a conclusion as to the cause of the damage of the roof, the scope of the damage, the method of repair and the cost of those repairs.[25] While ASI argues that it would have been better to inspect the damage closer to the hurricane, that begs the question as to whether

---

[18] Dec. R. Brown, ¶¶ 6-7 [D.E. 46-1].

[19] Dec. R. Brown, ¶ 8 [D.E. 46-1].

[20] Dec. R. Brown, ¶ 9 [D.E. 46-1].

[21] Dec. J. Mickey [D.E. 45-1].

[22] Dec. J. Mickey, ¶ 7 [D.E. 45-1].

[23] Dec. J. Mickey, ¶ 7 [D.E. 45-1].

[24] Dec. J. Mickey at Exhibit "C" [D.E. 45-1].

[25] See e.g. Tr. D. Cronin, p. 39-43:11-22 [D.E. 47-1].



there was prejudice because the passage of time will always be a factor. This is why there is a presumption of prejudice, but the Court must go beyond the mere passage of time and evaluate other factors surrounding the carrier's ability to adjust the Claim. Moreover, the question of whether it would have been better for the experts and the carrier to analyze the damage right after Hurricane Irma is a legal fallacy as *Laquer* made it clear, an insured only has a duty to notify the carrier of the damage when that damage is discovered. Here, the undisputed evidence is that Mr. Farrington did not discovery the damage until 9 months after Hurricane Irma. Thus, the question is only whether ASI was prejudiced due to the delay in reporting from March of 2019 through September 2019. There is sufficient evidence to show that it was not, but at the very least there exists a question of fact which serves to defeat ASI's Motion for Summary Judgment.

## II.     Measure of Damages

ASI attempts to limit the damages recoverable in this action to actual cash value (hereinafter "ACV") and asks this Court to adopt a similar decision reached in *CMR Construction & Roofing, LLC v. Empire Ind. Ins. Co.*, 2020 WL 1557887 (U.S. Dist. M.D. Fla. 2020). It is unfortunate that ASI failed to notify this Court that *CMR v. Empire* is currently pending before the United States Court of Appeals for the Eleventh Circuit on this very issue, for which ASI's counsel is also the law firm that represents Empire. *See CMR Construction & Roofing, LLC v. Empire Ind. Ins. Co.*, Case Number 20-11524-BB. Equally disingenuous is that ASI has not made this Court aware of the decision in *Citizens Property Insurance Company v. Tio*, where Citizens, which was represented by the very same law firm that represents ASI in this case, made the very same argument for which Florida's Third District Court of Appeal rejected. 2020 WL 1291855 (Fla. App. Ct. 2020). It should also be noted that although *Tio*



was published a week before the hearing in *CMR v. Empire*, counsel did not advise the court of the *Tio* decision, and therefore the *Empire* court was without the benefit of knowing of the current state of Florida law.

In *Tio*, Citizens attempted to limit Tio's damages to ACV because Tio had not undertaken repairs to his damaged property Citizens relied upon the policy's Loss Payment provision and Florida Statutes § 627.7011. *Id.* The trial court denied Citizens motion and submitted the damages for the jury's determination based upon replacement costs value (hereinafter "RCV"), for which Citizens appealed. *Id.* Florida's appellate court affirmed:

> Citizens makes the rather creative, though unavailing, argument that, when an insurer wrongfully denies coverage of a claim – causing its insured to file suit against the insurer for breaching the insurance contract – section 627.7011(3) limits the breach of contract damages a jury may award, as if the insurer had not breached the insurance contract. Citizens suggests that, after breaching the policy, it may enforce the terms of the policy at its convenience.
>
> Section 627.7011(3), however, governs an insurer's post-loss obligations in adjusting and settling claims covered by a replacement cost policy, and ***does not operate as a limitation on a policyholder's remedies for an insurer's breach of an insurance contract***. Citizens contracted with Tio to provide coverage for a direct loss to property covered by the policy. After Citizens breached that contractual obligation, the trial court properly instructed the jury on how to value the insured's relevant damages, and the jury rendered a verdict for Tio that was supported by competent substantial evidence.

*Id.* at *2.

When an insurer breaches an insurance contract, the insured is entitled to recover more than the pecuniary loss involved in the balance of the payments due under the policy in consequential damages, provided the damages were in contemplation of the parties at the inception of the contract. *Manor House, LLC v. Citizens Prop. Ins. Corp.,* 2019 WL 2306107 (Fla. App. Ct. 2019). A breach by the insurer should allow an insured to recover damages for replacement cost. *See Zaitchick v. Am. Motorists Ins. Co.,* 554 F. Supp. 209, 215-216 (U.S. Dist. S.D.N.Y. 1982)(insureds were entitled to recover replacement cost of home destroyed by fire



where insurer refused to pay any money to insureds, which made it impossible for them to comply with the condition precedent requiring them to first rebuild their home); *Gannon Int'l, Ltd. v. Lexington Ins. Co.,* 2008 WL 3244023, *2 (U.S. Dist. E.D.Mo. 2008)(genuine issues of material fact existed on issue of replacement cost coverage including whether Lexington's refusal to tender actual cash value made it impossible for Gannon to satisfy the precondition of replacing its roofs, and thus whether the condition is excused); *McCahill v. Commercial Union Ins. Co.,* 446 N.W.2d 579, 584 (Mich. Ct. App. 1989)(insurer's failure to advance funds that insured required in order to rebuild home excused insured from having to rebuild in order to recover for replacement cost of home); *State Farm Fire & Cas. Co. v. Watson,* 518 N.E.2d 357, 362 (Ill. Ct. App. 1987)(where insurer's denial of vandalism claim precluded insured from making repairs, insured entitled to recover replacement costs at trial).

The Policy requires ASI to settle losses to covered property "at replacement costs without deduction for depreciation." Notwithstanding, during the adjustment of the claim, ASI was entitled to "pay no more than the actual cash value of the damage until actual repair or replacement is complete." The breach stems from ASI's failure to properly settle the loss and pay the actual cash value associated with the replacement of the entire roof. It is undisputed that ASI's assessment did not involve replacement of the roof because it believed that damage was minor. However, the Policy and §627.7011 "require[] payment of actual cash value – not merely the insurance company's estimate of actual cash value." *Vazquez v. Southern Fidelity Property & Casualty, Inc.,* 230 So.3d 1242, 1243 (Fla. App. Ct. 2017). Thus, if the jury determines that the roof requires replacement, then ASI did not make payment of actual cash value, and is thus, in breach of contract. Therefore, under *Tio*, the proper measure of damages for such a breach is measured by RCV.



### III.     Replacement of the Roof

ASI argues that it is not obligated to pay to replace the roof, because 'matching' does not apply until repairs are actually made.  Recent case law out of Florida's Third District Court of Appeal recently held that when calculating ACV the obligation to make an initial payment, damages associated with "matching" are not a direct physical loss, and therefore, an insurer is only required to pay for those damages once repairs have been made. *Vazquez v. Citizens Prop. Ins. Corp.*, 2020 WL 1950831 (Fla. App. Ct. 2020).[26] In *Vazquez*, the plaintiff filed suit seeking recovery of ACV and not for RCV, and as a result, the analysis required a strict construction of the loss payment provision and Section 627.7011(3), not the available measure of damages as a result of a breach of contract case as addressed in *Tio*.

In *Vazquez v. Citizens*, the Court dealt with the replacement of unmatched tile floors, not roof tiles. The matching of tile floors is purely an aesthetic issue, not an issue of functionality and repairability – as we see in the replacement or repair of roof tiles.  Matching in the context of roof tiles goes beyond the "it doesn't look the same argument."  Roof tiles are manufactured in various shapes, sizes and molds, thus typically reasonable repairs cannot be made as the tiles will not properly interlock in order to allow a proper installation. Further, the Florida Building Code requires that the replaced materials on a roof conform with the others already affixed to the roof.[27]  As the dispute in this matter involves roof tiles and not floor tiles, *Vazquez* is inapplicable in this case.

Nevertheless, the need to replace the roof is not merely based on matching, but is rather a culmination of factors that render the roof irreparable.  Ryan Peak of CMR explained:

---

[26] In *Vazquez*, the plaintiff filed suit seeking recovery of ACV and not for RCV.  2020 WL
[27] Tr. R. Peak, p. 48:24-25, 49:1-4, 50:1-25 [D.E. 49-2].

TINELLI
FERNANDEZ
PROPERTY INSURANCE ATTORNEYS

And, I mean, if I can't get a compatible tile they would require the roof to be replaced because I can't make adequate repairs with compatible tile. It's just in addition to compatibility of the materials and not being able to get a permit, the underlayment being compromised, you know, and based on when the house was built and the, you know, the roof deck having to be renailed, you know -- so not only do we have the tile being discontinued, mismatched and me not being able to get a permit for it, you know, with the underlayment being compromised or exceeding the 25 percent rule also.[28]

Engineer Derek Cronin similarly testified:

One issue you have to look at is is this roof assembly damaged, you know, at 25 percent or more, which becomes a building code issue. To us the amount of lift, the amount of cracked tiles, the amount of slipped tiles, et cetera, we believe the roof has been compromised by 25 percent, so by Florida building code that also, as a design engineer, I wouldn't be comfortable signing and sealing a document and taking responsibility for the roof being repaired. I would just -- I wouldn't be able to sleep at night if I did that. So from a design engineering standpoint, I wouldn't feel it would be following the standard of care to allow a repair protocol on the project for a lot of reasons.

Secondly, because of the lift we've seen, the deflection of the trusses, et cetera, although the roof membrane may not be showing major signs of water leakage, we believe over time it has been compromised from both its age, from the hurricane event, the lift causing the fasteners to stop moving, we believe it's just a matter of time for that membrane to where it's used a lot of its life where eventually there's going to be water filtration.

So, from an engineering standpoint, as a design engineer, I couldn't see a good way following the standard of care as an engineer to do a repair. So to me, you know, the only proper way to repair it and to make the client whole in this is to do a full re-roof, because at that point we're able to remedy any potential issues regarding rotations for the waterproofing membrane. Furthermore, there's an issue getting replacement tiles, because to comply with the NOA, you would have to find the exact manufacturer, Pioneer, the exact profile of Pioneer, and on top of that you'd have to find the exact color. And even then it's not going to look the same because the other part of the roof has aged and looks different. So it would be extremely difficult to find the same tile color and profile, although possible, I think improbable. So because of those two issues we're -- we do not feel that repairs are a viable option.[29]

---

[28] Tr. R. Peak, p. 76:2-12 [D.E. 49-2].

[29] Tr. D. Cronin, p. 68:9-25, 69:1-24 [D.E. 47-1].



Unlike *Vazquez*, replacement of the roof is not limited to the need to simply match the undamaged tile. Pursuant to the deposition testimony of Ryan Peak and Derek Cronin, there remails a question of facts as to the proper methodology of repair due to the physical damage to the roof itself.

### IV.    Ordinance & Law

The crux of ASI's argument is that in order to recover damages resulting from the enforcement of any ordinance or law regulation construction or repair is that those damages must be 'incurred' before they are owed. ASI takes the incurred language and attempts to persuade this Court to enter summary judgment because repairs have not been made, and therefore increased costs were not expended.

Florida's Supreme Court has clarified that 'to incur' does not necessarily mean to have actually expended it, but rather to become legally liable for the cost. *Ceballo v. Citizens Property Ins. Corp.*, 967 So.2d 811, 815 (Fla. App. Ct. 2007). In *Jossfolk v. United Property & Cas. Ins. Co.*, the court held that evidence that the city required compliance with the building code was necessary to show the costs were incurred. 110 So.3d 110, 113 (Fla. App. Ct. 2013). A showing that the insured entered into a contract to rebuild storm damaged home would be sufficient to show that additional costs had been incurred in order to recover ordinance or law related damages. *Everhart v. Citizens Property. Ins. Corp.*, 90 So.3d 374 (Fla. App. Ct. 2012)(Makar, J., specially concurring).

It is undisputed that Mr. Farrington has entered into a contract with CMR to make repairs to his roof. Both CMR[30] and Derek Cronin have testified that one of the reasons the

---

[30] Tr. R. Peak, p. 76:2-12 [D.E. 49-2].

roof requires replacement is because they must make repairs in compliance with Florida's Building Code:

> Q. Okay. So, to sum up the basis of the conclusion that you have to replace it, you're saying that the building code requires it because more than 25 percent of the roof surface is damaged, correct?
>
> A. Yes.[31]

There exists sufficient evidence that increased costs to make repairs to comply with an ordinance or law have been incurred. Accordingly, entry of summary judgment is not warranted.

**V.   Screened Enclosure**

There is no dispute that the endorsement excludes coverage for the screen material or costs associated with or replacing screens. In the event there are such costs contained in its estimate, CMR withdraws its claim for any such items.

Wherefore, CMR respects this Honorable Court to enter an Order denying ASI's Motion for Summary Judgment, and all further relief this Court deems just.

**CERTIFICATE OF SERVICE**

I certify that on September 28, 2020, I electronically furnished the foregoing document to the parties identified on the below Service List.

/s/ *Ashley Rius*
ASHLEY RIUS

**Service List**

***Attorenys for Defendant***
Tracy Jurgus, Esq.
tjurgus@butler.legal

---

[31] Tr. D. Cronin, p. 69:25, 70:1-4 [D.E. 47-1].